[Cite as *In re G. Children*, 2020-Ohio-3649.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

IN RE: G. CHILDREN

:      APPEAL NO. C-200109
           TRIAL NO.    F17-676Z

:

:      *O P I N I O N.*

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  July 8, 2020

*Jeffrey J. Cutcher*, for Apellant Father,

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Alyssa M. Miller*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Jeffrey A. McCormick,* Guardian ad Litem for minor children.

**CROUSE, Judge.**

{¶1}   Father has appealed from the Hamilton County Juvenile Court's judgment granting permanent custody of his minor children M.D.G. and M.K.G. to the Hamilton County Department of Job and Family Services ("HCJFS").  He argues in two assignments of error that the termination of his parental rights was against the manifest weight of the evidence, and that the juvenile court erred in weighing his failure to complete services against him when the services could not be provided by HCJFS.  He requests that he be given custody of both children, or, in the alternative, custody of M.D.G.

{¶2}   For the reasons discussed below, we overrule both assignments of error and affirm the judgment of the juvenile court.

### *Factual Background*

{¶3}   HCJFS was granted interim custody of the children on May 26, 2017, due to concerns over mother's substance abuse.  At the time, mother and the children were living together at a drug treatment center in Hamilton County, and father was living in Butler County.  M.K.G. was approximately three years old, and M.D.G. was only a few months old.  HCJFS developed case-plan services for both father and mother.  Mother died in January 2018.  On April 29, 2019, HCJFS filed a motion for permanent custody, which was opposed by father.  The permanent-custody trial was conducted over two days, August 19, 2019, and September 20, 2019.

{¶4}   Rachel Kennedy was the HCJFS caseworker at the time of trial.  She testified that as part of his case plan, father completed a FAIR Diagnostic Assessment

("DAF") in July 2017 that recommended that he complete a YWCA domestic-violence assessment, parenting classes, and toxicology screens. Kennedy testified that father completed two toxicology screens. The first test in August 2017 came back positive for marijuana, but the second and most recent test in October 2017 came back negative.

{¶5} Kennedy testified that in February 2018, father completed the YWCA domestic-violence assessment, which recommended individual counseling "due to some manipulative behaviors that were displayed during the interview." Father completed a second DAF in July 2018 that recommended that he complete a psychological evaluation. Kennedy testified that father did not complete the psychological evaluation until February 2019, and did not start the individual counseling recommended by the YWCA assessment until the end of July 2019, less than one month before the permanent-custody trial began.

{¶6} Kennedy testified that father started parenting classes in March 2018, but did not complete the parenting program. He completed the classes, but did not complete the one-on-one coaching. Beech Acres, the provider for the parenting program, reported to Kennedy that father refused to complete coaching because he did not believe that the judge had ordered him to do so. Kennedy testified that father contacted her at the end of July 2019 about scheduling the one-on-one coaching, but she was unable to get it scheduled prior to trial.

{¶7} Kennedy testified that when she took over in January 2018, father was not visiting the children on a consistent basis and his visitations had been canceled by the Family Nurturing Center ("FNC"). Father started visiting the children

consistently in February 2018. She testified that father's visitations remained at the strictest level of supervision, the facilitated level, for the duration of the case.

{¶8} Kennedy testified that the assessments father completed were in Hamilton County. She testified that due to Medicaid standards, Hamilton County was unable to refer father to the counseling it required. However, HCJFS recommended multiple agencies near father's residence in Butler County that could provide counseling.

{¶9} Kennedy testified that in March 2018, HCJFS received an allegation that father had sexually abused M.K.G. This does not appear to have been the first allegation of sexual abuse, as M.K.G. was previously interviewed by the Mayerson Center in October 2017 about sexual abuse, but no charges were filed and no changes were made to the case plan as a result of that interview. Kennedy testified that after the allegation in March 2018, M.K.G. was placed in a respite foster home while HCJFS conducted an investigation. HCJFS also organized an interview at the Mayerson Center with M.K.G. and placed M.K.G. in Trauma Focused Cognitive Behavioral Therapy.

{¶10} On March 28, 2018, HCJFS filed a case plan suspending visitations between father and M.K.G. The magistrate conducted a hearing on July 30, 2018. On August 6, 2018, she issued an order adopting the case plan and suspending visitations between father and M.K.G. The magistrate noted that the Mayerson Center assessor could not confirm the allegations of sexual abuse because MKG "did not make disclosures and [her] developmental delay and age created an inability to complete a forensic interview." However, based on testimony from Dr. Pamela Miller and her recommendation that it would be harmful for MKG to resume

visitations, the magistrate found that it was in the best interest of M.K.G. for her visitations to remain suspended.

{¶11} Dr. Pamela Miller testified at the July 30, 2018 hearing regarding the suspension of father's visitations with M.K.G. and at the permanent-custody trial. She testified that she is a national expert in child abuse and neglect policy according to the Center for Child Policy. She testified that children as young as three years old can give truthful and accurate accounts of sexual abuse.

{¶12} Miller testified that she started working with M.K.G. in March 2018 as part of her trauma therapy and HCJFS's investigation into the sexual abuse allegation. Miller engaged M.K.G. in "play therapy." She testified that during their first session, without prompting, M.K.G. said, "My daddy touched my private parts and it made me mad," and "it was my daddy with the ponytail."

{¶13} After five to ten more sessions, Miller moved from play therapy to trauma focused cognitive behavioral therapy. She met with M.K.G. once a week for 45 minutes to an hour. She testified that eventually M.K.G. started to disclose more information regarding the abuse. Miller testified that M.K.G. told her that "it was the daddy she had when she was a baby, the daddy she had when she was little, the daddy she had that hurt her mommy before her mommy died, her daddy that she had before she was here, referring to her foster home." Miller testified that M.K.G. told her that "daddy touching her private parts happened in a crib." She said it made her private parts turn red and that it made her mad and sad. Miller testified that one time M.K.G. demonstrated for her—she picked up a doll and said " 'I'm not going to touch their private parts, but when my daddy touched my private parts, he did it like this,' and she rubbed herself on her vaginal area over her clothes." Miller testified

regarding guardian ad litem ("GAL") exhibit one, M.K.G.'s "trauma narrative," in which M.K.G. described sexual abuse by her father. In her order suspending father's visitations, the magistrate noted that father has a ponytail and foster father does not. He also noted that father and mother had a history of domestic violence.

{¶14} Miller testified that when she first started working with M.K.G., she was displaying "a lot of sexually acting-out behaviors." Miller conducted a Child Sexual Behavior Inventory ("CSBI") with M.K.G. Miller testified that the CSBI identifies a child's sexually acting-out behaviors, whether the behaviors are normal for her age, and which behaviors are not normal for her age and are indicative of sexual abuse. Miller testified that M.K.G. scored the highest score possible on the CSBI, and that her scores reflected that M.K.G. had "clinically significant sexualized behaviors and addictive sexual abuse" for a girl her age. Miller testified that she does not have any concerns about M.K.G.'s placement in the foster home or about other adults committing the abuse.

{¶15} Miller acknowledged that HCJFS was unable to substantiate the sexual-abuse allegations. However, she testified that this is not uncommon, and that HCJFS typically only substantiates a very small portion of cases of sexual abuse against children.

{¶16} Father testified that he was the one who sounded the alarm on the abuse. He testified that during one of his visitations with M.K.G., without prompting, she told him "my daddy touched my privates last night." He testified that the FNC facilitator heard what M.K.G. said, and alerted his supervisor. Father testified that he called 241-KIDS, but they told him that they could not do anything about it at the moment. Father testified that the Middletown Police interviewed him

about the abuse, and he took a polygraph. He testified that the police have not contacted him since.

{¶17} Regarding his case plan, father testified that he does not feel like he needs counseling, but he is willing to do it to get his children back. He testified that he had trouble completing the counseling because he does not have insurance and agencies would not accept him without insurance. Father testified that he can get insurance through his work, but he has not signed up for it. Father claimed that until two to three months before trial he thought HCJFS could refer him for counseling, and so he would not need insurance.

{¶18} Father testified that he completed the parenting classes, and that he had been asking Kennedy to contact Beech Acres for over two years in order schedule the parenting coaching, but she never did. Father testified that his visitations at FNC were canceled because he missed two in a row due to work. He had to "go back through the process again" to get visitations at FNC and was put on a waiting list. He testified that as soon as he was off the waiting list, he attended visitations consistently.

{¶19} Victoria Hitchens testified that she facilitated father's visitations with M.D.G. at FNC between January 12, 2019, and June 15, 2019. She testified that M.D.G. was "very receptive to [father]," and would initiate play and affection with father. Hitchens testified that father remained at the "facilitated" level of visitation, the strictest level, throughout the duration of the case. She testified that often in a facilitated setting the FNC facilitator does 50 percent or more of the interactions and redirections with the child, and has to teach the parent how to interact and communicate with the child. Hitchens testified that she did not have to do those

things with father, and so she felt that father's visitations should be reduced to the "monitored" level. Hitchens contacted HCJFS about reducing the level of supervision to "monitored." She testified that she found out that the previous facilitator had made the same recommendation to HCJFS. She testified that HCJFS denied her request because father had not been completing his case-plan services. She testified that HCJFS's explanation did not change her opinion because monitored visitations are still supervised, just not on a one-on-one basis, and so she would still recommend that father's visitations be reduced to the monitored level.

{¶20} Kennedy testified that HCJFS declined to reduce the level of supervision because father failed to display "behavioral changes by attending therapy or working through case plan services."

### Second Assignment of Error

{¶21} For ease of discussion, we address father's second assignment of error first. Father claims that the trial court erred in weighing his failure to complete services against him in its permanent-custody determination. He presents two arguments. First, he argues that when HCJFS requires services of a parent that HCJFS is unable to provide, completion of those services should not be held against the parent. Second, he argues that when the county of residence is a barrier to providing services, HCJFS should be required to transfer the case to the county that is able to provide services.

{¶22} Father claims that he failed to complete individual counseling because HCJFS could not refer him for counseling in Hamilton County, and he could not obtain counseling in Butler County because he did not have insurance. But father admitted that he had the ability to sign up for insurance through his work on an

8

annual basis, and yet never did so. Kennedy testified that although HCJFS could not refer father for counseling services since he was not a resident of Hamilton County, she discussed options with him in Butler County, including Butler Behavioral Health, which is the agency that father eventually went to for counseling at the end of July 2019.

{¶23} Father admitted that insurance was not an impediment to completing parenting coaching. He testified that he contacted Kennedy repeatedly to schedule coaching, but she did not contact him back or follow through. Kennedy testified that Beech Acres reported to her that father refused to complete coaching because he did not believe that it was part of the court's order. Kennedy testified that father did not reach out to her about completing parenting coaching until July 2019.

{¶24} We find father's arguments unpersuasive. Contrary to father's assertion, HCJFS does not "provide" the types of services he failed to complete, such as counseling and parenting education. Rather, it refers a parent to outside agencies for completion of such services.

{¶25} As this court stated in *In re W.W.,*

Case plans are tools to facilitate reunification; therefore, "the plan and the agency's efforts should account for the respective abilities of the parents and children in pursuing individualized concerns, goals, and steps necessary for reunification." But the agency's responsibility to facilitate reunification is not unlimited. The issue is whether the agency's case planning and efforts were reasonable and diligent, and not "whether there was anything more" that the agency could have done.

*In re W.W.,* 1st Dist. Hamilton Nos. C-110363 and C-110402, 2011-Ohio-4912, ¶ 61, quoting *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53 and 5-02-54, 2003-Ohio-1269, ¶ 10.

{¶26} When children have been taken into temporary custody due to concerns about their safety and well-being, it is the parent's responsibility to comply with the court-ordered case plan. HCJFS was not required to actually provide the services for father or set up the case plan in a way most convenient for him. Rather, HCJFS was merely required to provide "reasonable and diligent" case planning and efforts. S*ee In re W.W.* at ¶ 61. We hold that HCJFS acted reasonably and with diligence to effect reunification and that the court did not err in weighing father's failure to complete services against him.

{¶27} Father's second assignment of error is overruled.

### *First Assignment of Error*

{¶28} In his first assignment of error, father argues that the termination of his parental rights was against the manifest weight of the evidence. "Reviewing a juvenile court's grant of permanent custody requires that we independently find that clear and convincing evidence supports the decision." *In re L.M.B. & M.A.B.,* 1st Dist. Hamilton Nos. C -200033 and C-200044, 2020-Ohio-2925, ¶ 8. Clear-and-convincing evidence produces "in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re K.H.,* 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶29} In reviewing a claim that the juvenile court's decision was against the manifest weight of the evidence, we "weigh the evidence and all reasonable

inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the [juvenile] court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed." *In re A.B.,* 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 16.

{¶30} When children have been previously adjudicated abused, neglected, or dependent and temporary custody has been granted to HCJFS pursuant to R.C. 2151.353(A)(2), HCJFS may then move for permanent custody of the children pursuant to R.C. 2151.413(A) and 2151.414. The court will grant permanent custody to HCJFS if a two-prong test is satisfied. The court must find, by clear-and-convincing evidence, that: (1) one of the enumerated conditions in R.C. 2151.414(B)(1)(a)-(e) is met, and (2) permanent custody is in the best interest of the children under R.C. 2151.414(D)(1)(a)-(e). *See* R.C. 2151.414(B)(1).

### *The First Prong—R.C. 2151.414(B)*

{¶31} The first prong can be satisfied by any one of five conditions. R.C. 2151.414(B). One condition is if a child has been in the temporary custody of the agency for 12 months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d). The starting point for determining when the 12-in-22 clock starts is either the date the child was adjudicated dependent or 60 days after the removal of the child from the home, whichever is earlier. R.C. 2151.414(B)(1)(e). The end-point for the 12-in-22 clock is the date the agency filed the motion for permanent custody. *In re C.W.,* 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 26.

{¶32} M.K.G. and M.D.G. are considered to have been in the temporary custody of HCJFS since July 25, 2017, 60 days after they were removed from the

home. The motion for permanent custody was filed April 29, 2019. Therefore, the 12-in-22 provision is satisfied as to both children.

### *The Second Prong—R.C. 2151.414(D)(1) Best-Interest Analysis*

**{¶33}** Under the second prong, the juvenile court must determine whether granting permanent custody to HCJFS is in the best interest of the children. R.C. 2151.414(B)(1). Pursuant to R.C. 2151.414(D)(1), the court may find that permanent custody is in the best interest of the children upon consideration of all relevant factors, including:

(a) the children's relationships with the parents, siblings, foster caregivers, and any other person who may significantly affect the children,

(b) the wishes of the children, with consideration granted for their maturity,

(c) the custodial history of the children, including whether the children have been in the custody of a public child services agency for 12 or more months in a consecutive 22 month period,

(d) the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to HCJFS, and

(e) whether any of the factors in divisions (E)(7) to (11) apply in relation to the parents and children.

**{¶34}** No single factor is given greater weight or heightened significance. *In re P.,* 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, ¶ 35.

**{¶35}** The magistrate and juvenile court both found that R.C. 2151.414(D)(1)(a) weighed in favor of permanent custody. The magistrate and court acknowledged that father is bonded with M.D.G., but noted that father has not

12

visited with M.K.G. since March 2018 due to Miller's recommendation. The court found that the children are bonded to each other and should not be separated. Father argues that this finding of a bond between the children is unsupported by the evidence at trial and is simply an assumption by the court.

{¶36} At trial, Hitchens testified that M.D.G. was "very receptive to [father]," and would initiate play and affection with father. Father testified that when he had been permitted to visit M.K.G., she was happy to see him and they were affectionate.

{¶37} However, Miller testified that reunification with father would be "devastating" to M.K.G.'s mental health. Miller testified that M.K.G. told her that she was scared of "daddy," and that when Miller asked M.K.G. how she felt once her visitations with father were suspended, M.K.G. answered, "Better."

{¶38} The children have been together in the same foster home since May 2017, and Kennedy testified that they are doing well in the home and the foster family wishes to adopt. Although there was no direct testimony regarding their bond, it was reasonable for the court to assume that it would not be in their best interest to separate them.

{¶39} The magistrate found that R.C. 2151.414(D)(1)(b) weighed in favor of granting permanent custody. In support of her finding, the magistrate cited the GAL's recommendation of permanent custody. However, although the wishes of a child may be expressed through the GAL, the GAL's recommendation is separate and distinct from a child's wishes. *In re P.,* 1st Dist. Hamilton Nos. C-190309 and C-190310, 2019-Ohio-3637, at ¶ 37. The juvenile court found that the children are too young to express their wishes. At the time of trial on August 19, 2019, M.K.G. was

approximately five years old and M.D.G. was approximately two years old. The juvenile court correctly found that R.C. 2151.414(D)(1)(b) was inapplicable.

{¶40} Under R.C. 2151.414(D)(1)(c), the 12-in-22 condition is met for both children, and the children have been in the same foster home since the start of the case. Thus, R.C. 2151.414(D)(1)(c) weighs in favor of permanent custody.

{¶41} Under R.C. 2151.414(D)(1)(d), the magistrate and juvenile court both found that father was unable to provide a legally secure permanent placement. The juvenile court found that "father has not demonstrated he is prepared or able to take both children or will be in the near future."

{¶42} It is undisputed that father has stable income and housing. Also, although there appears to have been some concerns regarding substance abuse early in the case, father tested negative in October 2017, and HCJFS has not referred father for any screenings since. However, a legally secure permanent placement "is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *In re P.* at ¶ 42, quoting *Matter of K.W.,* 2018-Ohio-1933, 111 N.E.3d 368, ¶ 87 (4th Dist.).

{¶43} Father did not complete the YWCA assessment until seven months after he was referred. He did not complete the psychological evaluation until a year after he was referred. He completed the parenting classes in March 2018, but never completed the one-on-one parenting coaching. He did not start the individual counseling until the end of July 2019, 16 months after he was recommended for counseling by the YWCA assessment, three months after the motion for permanent custody was filed, and less than one month before trial.

{¶44} We also cannot ignore the compelling testimony of Miller, during which she stated that she believed reunification of M.K.G. with father would be devastating to her mental health. Father does not dispute Miller's testimony. In fact, father acknowledges in his brief that "the testimony of Ms. Pamela Miller regarding the current state of M.K.G.'s mental health, coupled with the suspension of Father's visits with M.K.G. is a mountain of evidence to overcome." We agree. While the sexual-abuse allegations were unsubstantiated, there was clear-and-convincing evidence that M.K.G. would be traumatized if father were given custody of her. Thus, the juvenile court's finding that father could not provide a legally secure placement for M.K.G. was supported by clear-and-convincing evidence.

{¶45} Father contends that because there was no direct evidence of a bond between the children, they should be split up and he should be given custody of M.D.G. However, as stated above, it was reasonable for the juvenile court to presume a bond between the children, and to find that it was not in their best interest to separate them. Also, father did not complete his case plan and began individual counseling less than a month before trial. For these reasons, the juvenile court's finding that father could not provide a legally secure placement for M.D.G. was supported by clear-and-convincing evidence.

{¶46} The magistrate and juvenile court both found that none of the factors in R.C. 2151.414(E)(7) to (E)(11) applied, and so R.C. 21515.414(D)(1)(e) was inapplicable.

{¶47} The juvenile court's holding that granting permanent custody to HCJFS was in the best interest of the children was supported by clear-and-convincing evidence and was not against the manifest weight of the evidence.

15

### *Conclusion*

**{¶48}** For the reasons discussed above, father's assignments of error are overruled and the judgment of the juvenile court is affirmed.

*Judgment affirmed.*

**MOCK, P.J.,** and **ZAYAS, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.